06-5486-cv
Brady v. Wal-Mart Stores, Inc.

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued:    February 20, 2008                    Decided: July 2, 2008 )

Docket No. 06-5486-cv

_____

PATRICK S. BRADY,

*Plaintiff-Appellee*,

− v. −

WAL-MART STORES, INC., YEM HUNG CHIN,

*Defendants-Appellants*,

JAMES BOWEN,

*Defendant*.

_____

Before: KEARSE, CALABRESI, and KATZMANN, *Circuit Judges*.

Appeal from a final judgment of the United States District Court for the Eastern District of New York, awarding damages to Plaintiff-Appellee in a suit under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and New York Human Rights Law, N.Y. Exec. Law § 290 *et seq*.  We affirm.

DOUGLAS H. WIGDOR, Thompson Wigdor & Gilly LLP, New York, N.Y., *for Appellee.*

JAMES F. BENNETT, Dowd Bennett LLP, St. Louis, Mo. (Megan S. Heinsz, Dowd Bennett LLP, St. Louis, Mo., Joel L. Finger, I. Michael Kessell, Littler Mendelson, P.C., New York, N.Y., *on the brief*), *for Appellants.*

BARBARA L. SLOAN (Ronald C. Cooper, Gen. Counsel, Lorraine C. Davis, Acting Assoc. Gen. Counsel, Vincent J. Blackwood, Ass't Gen. Counsel, *on the brief*), Office of General Counsel, EEOC, Washington, D.C., *for Amicus Curiae EEOC in Support of Appellee.*

GUIDO CALABRESI, *Circuit Judge*:

Plaintiff-Appellee Patrick S. Brady filed suit in the United States District Court for the Eastern District of New York (Orenstein, *M.J.*) against his former employer, Wal-Mart Stores, Inc., and his former boss, Yem Hung Chin (collectively, "Appellants"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* The jury returned a mixed verdict, finding for Appellee on some claims and Appellants on others, and awarding Appellee compensatory, economic, punitive, and nominal damages. The district court struck the economic damages award, reduced the punitive damages award to the statutory cap, and ordered that a new trial be held if Appellee did not accept a remittitur of the compensatory damages award, *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 218 (E.D.N.Y. 2006), which he did.

**I. Background**

"When an appeal comes to us after a jury verdict, we view the facts of the case in the light

most favorable to the prevailing party." *Kosmynka v. Polaris Indus.,* , 462 F.3d 74, 77 (2d Cir. 2006). Those facts are as follows.

Appellee Patrick Brady was, at the time pertinent to this suit, a nineteen-year-old man with cerebral palsy. A witness testified that "[j]ust by looking at him, you could tell he had a disability." His disability manifested itself in noticeably slower walking, walking with a shuffle and limp, recognizably slower and quieter speech, not looking directly at people when talking to them, weaker vision, and a poor sense of direction. Brady himself testified that, "It basically affects everything I do." His father testified that, "It affects everything he does, his whole life, everything about him" and that "[i]t affects . . . his driving, the school work, his working ability, his eating, his walking, his seeing. Everything involved in each one of those aspects and so much more." And his mother testified that, "It's just everything he does. . . . [I]t's really . . . life-changing . . . . I mean, the way he walks, the way he sits, his mannerisms. The way he thinks. I mean, he learns differently. His eyes—it's just—it touches everything. The way he eats. I mean, he had auto/motor problems [sic], just the way—his posture."

In 2002, after having worked for about two years in a local pharmacy receiving prescriptions and dispensing prescription drugs without incident, Brady applied for a job in the pharmacy department of the Wal-Mart store in Centereach, New York. The part-time pharmacy job which he sought was classified as a "Salesfloor Associate" position. As part of the application, he was asked to sign a document entitled Job Description, which was generic to all Salesfloor Associate positions, and thereby to certify that he "ha[d] the ability to perform the essential functions of th[is] position either with or without a reasonable accommodation." The job functions listed included, "[f]requently pick up, lift, carry, and place items of varying sizes,

weighing up to and greater than 50 pounds, while moving up and down a ladder." [**A 653**] Brady marked that he had the ability to perform the listed tasks "either with or without a reasonable accommodation." Following two interviews and a drug test, he was hired and told when to report to work.

Upon beginning work, he was given a vest with "pharmacy" on it, and he was instructed to stock merchandise and dispense prescriptions. He very quickly perceived that Appellant Chin, his boss, was unhappy with his performance. He testified that "she was kind of short with me. She knew there was something wrong with me. . . . [She was s]hort, as if she wasn't happy with me. She didn't appear to like me, the fact that I was hired for the pharmacy. . . . She told me to speed it up, you know, as if I was working slow, to speed it up a little bit." Chin testified that she thought that Brady was too slow and that he appeared to have difficulty matching customers' names with their prescriptions. She also testified that she was "completely alarmed at that time, and [she] knew there was something wrong." She thought to herself, "forget it, this is ridiculous . . . . [O]kay, forget it, this is not working . . . . I need to take control back." She thought Brady's performance was "absolutely awful," and she "wanted [him] away from [her] prescriptions." Although Wal-Mart had an institutional "coaching policy," she never approached Brady about participating in it, because "I really didn't think it kind of applied. I didn't know how to teach him to find names better . . . ." Brady testified that he never handed out the wrong prescription, was never unable to find a prescription in the bin, and never required assistance from Chin or any other co-worker to perform his job.

At the end of his first shift, Brady requested his schedule for the upcoming week. Chin told him that she would call him with his schedule. She did not, and when Brady's mother

suggested that he go to the store and ask about his schedule, he told her that, "I don't think [Chin] wants me there." He did go into the store, and Chin told him that "she had been meaning to call [him] about [his] schedule but she hadn't gotten around to it." She then asked him if he would be willing to work in another department because she really needed to hire a pharmacy technician, rather than a pharmacy assistant. Brady believed this to be a lie because no one had previously mentioned that the pharmacy needed to hire a technician. Brady worked two more days in the pharmacy without incident. At the end of the second day, he again asked about his schedule for the coming week and was again told that Chin would call him. Again, she did not. When Brady went back to the store, another pharmacist told him that he would remind Chin to call him. Once again, she did not. When he returned to the store the next day, Chin "seemed visibly annoyed to see [him], as if she didn't want anything to do with [him]." Chin told him to go to the personnel department.

The personnel manager told Brady that the only available job was collecting shopping carts and garbage in the parking lot. Brady felt that this job was "degrading" because "it really doesn't involve any skill or knowledge and . . . I felt that they put people out there that couldn't possibly do anything else." The parking lot job had a different uniform, and Brady understood it to be a demotion. He also testified that, because of his disability, he was less suited to it than he was to working in the pharmacy.

After Brady's transfer to the parking lot, his father came to the store and spoke with the assistant store manager, telling him that he hoped his son's disability had not played any role in the transfer. The assistant manager promised to investigate, and later James Bowen, the store manager, called Brady's father and, according to Brady's father, told him "that he didn't think

that [Brady] had a fair chance at this job; that [Chin] didn't give him a fair chance and she didn't handle it the right way . . . . And he told me what Ms. Chin had said, that [Brady] wasn't fit for the job. And then she said that, 'I'll put him back in the pharmacy, but if we get sued, it's on you.'" Bowen also stated that new employees were typically given a training period and that Brady should have been given more time to learn the job.[1]

Bowen then called Brady into his office. He told Brady about Chin's complaints, but Brady replied that he had two years of experience at another pharmacy without problems. Bowen asked Brady if he was happy with the parking lot job, and Brady replied that he was not. Brady was then transferred to the food department, where he was asked to stock shelves and zone merchandise. Bowen walked Brady to the food department, but gave him no training or instruction, nor did he provide him a uniform. Brady was not offered the option of returning to the pharmacy. At the end of the day, Brady was given a work schedule for the next week that conflicted with his community college schedule, a schedule he had noted on Wal-Mart's availability forms. Frustrated, Brady called the store the next day and quit.

Brady testified that, after quitting, he became depressed and, for the first time, sought psychiatric help. He and his parents testified that he lost self-confidence, withdrew from his family, became angry, and lost interest in his community college studies.

He subsequently brought this suit, alleging a number of counts of discrimination under the ADA and New York Human Rights Law. Specifically, he alleged that Wal-Mart took the

---

[1] Brady had not been given the standard ninety-day probationary period and training generally provided to new employees, and he received no coaching, in violation of Wal-Mart's "coaching for improvement" policy. A Wal-Mart pharmacist, Joan Little, testified that it would normally take "one to three months just to [learn] the basic functions" of working in the pharmacy.

following discriminatory actions: (1) transferring him from the pharmacy to the parking lot; (2) transferring him from the parking lot to the food department; (3) creating a hostile work environment; (4) failing reasonably to accommodate his disability; and (5) constructively discharging him. He also claimed that Wal-Mart made prohibited pre-employment disability inquiries, and he alleged intentional infliction of emotional distress.

The jury returned a mixed verdict. It found that Brady was disabled and/or was regarded as disabled within the meaning of the ADA and that Wal-Mart discriminated against him on the basis of his disability by transferring him from the pharmacy to the parking lot. It also found that Wal-Mart subjected him to a hostile work environment. Moreover, it found that Wal-Mart failed reasonably to accommodate him and that Wal-Mart had made an impermissible pre-employment inquiry in its job description. It found that Chin aided and abetted in the discrimination but that Bowen—who was a defendant below—did not. The jury, however, also found that Brady was not constructively discharged, and that he had not been subjected to intentional infliction of emotional distress.

Based on these findings, the jury awarded Brady $2.5 million in compensatory damages, $9,114 in economic damages, $5 million in punitive damages, and $2 in nominal damages. The district court apportioned all of the compensatory damages to the state law claim and all of the punitive damages to the ADA claim. The court struck the economic damages award because Brady did not prevail on his constructive discharge claim. And, pursuant to 42 U.S.C. § 1981a(b)(3)(D), the punitive damages award was reduced to the statutory cap of $300,000. Appellants filed a Rule 50(b) motion for judgment as a matter of law and a Rule 59 motion for a new trial. The court denied those motions except that it ordered that a new trial on the issue of

compensatory damages be held unless Brady accepted a remittitur of the compensatory damages award from $2.5 million to $600,000. *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d at 217-18. Brady accepted the remittitur. This appeal followed.

**II. Discussion**

The appeal involves seven issues: (1) whether Appellants waived their right to move for judgment as a matter of law post-verdict by failing properly to move for judgment as a matter of law at the close of all of the evidence; (2) whether the district court erred in not granting Appellants judgment as a matter of law on Appellee's disability discrimination claims; (3) whether the district court erred in not granting Appellants judgment as a matter of law on Appellee's failure-to-accommodate claim; (4) whether the district court improperly admitted into evidence a nationwide consent decree and, if so, whether a new trial should be granted; (5) whether the district court erred in not granting Appellants judgment as a matter of law on Appellee's claim that Appellants made an impermissible pre-employment inquiry; (6) whether the district court erred in not granting Appellants judgment as a matter of law on Appellee's claim for punitive damages; and (7) whether the district court erred in its ruling on Appellants' application for remittitur of damages. We deal with each issue in turn.

*A. Waiver*

A prerequisite for a motion for judgment as a matter of law post-verdict is that the movant had also moved for judgment as a matter of law "at the close of all of the evidence." Fed. R. Civ. P. 50(a), (b) (1995). Appellee asserts that Appellants failed to meet this requirement

because, although they moved for judgment as a matter of law at the close of Appellee's case, they did not so move at the close of all the evidence. On the final day of testimony, immediately before the first witness was called, however, Appellants' counsel renewed his Rule 50 motion, saying, "I assume you don't need me to raise [it] in any kind of detail." The court replied, "No. Your 50(a) motion is denied without prejudice to renewing it, if appropriate, *after the verdict*." (emphasis added).

We have held that where the trial judge has indicated that renewing a previously made motion for judgment as a matter of law at the close of all the evidence was not necessary, and where the opposing party could not reasonably have thought that the motion was dropped, then judgment as a matter of law may be sought post-verdict. *See Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 61-62 (2d Cir. 1988); *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 n.3 (2d Cir. 1987). Both were clearly so here; accordingly, Appellants' Rule 50(b) motion was not barred.

### B. Disability Discrimination Claims

This Court reviews *de novo* a district court's denial of a motion for judgment as a matter of law. *Wolf v. Yamin*, 295 F.3d 303, 308 (2d Cir. 2002). Such a motion "may only be granted if there exists 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or the evidence in favor of the movant is so overwhelming 'that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" *Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997) (alterations in original) (quoting *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir. 1994)). In reviewing

such a motion, this Court "'must give deference to all credibility determinations and reasonable inferences of the jury,' and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)).

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show (a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability. *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004). Appellants contend that Brady did not demonstrate that he was disabled within the meaning of the ADA or was perceived to be so. And they also claim that he did not show that he suffered an adverse employment action because of his (alleged) disability.

The evidence presented, including descriptions of Brady's cerebral palsy, was sufficient to permit the jury to find that he was in fact disabled under the ADA. *See* 42 U.S.C. 12102(2)(A). In addition, we think the record amply supports the conclusion that he was perceived to be disabled. *See* 42 U.S.C. § 12102(2)(C) (defining disability so as to include certain types of impairments or "being regarded as having such an impairment"). Chin herself testified that she regarded Brady to be slow and that she "knew there was something wrong" with him. Brady's father testified that the store manager told him that Chin said that Brady "wasn't fit for the job."

We also find that there was sufficient evidence for the jury to conclude that Brady's transfer from the pharmacy to the parking lot constituted an adverse employment action.

Although this transfer did not affect his wages or benefits, it resulted in a "less distinguished title" and "significantly diminished material responsibilities," and therefore constituted an adverse employment action. *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002) (internal quotation marks omitted); *see also De la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996). We cannot agree with Appellants that the short duration of Appellee's transfer to the parking is a proper basis for finding, as a matter of law, that there no adverse employment action occurred. This is especially so in light of the fact that Brady was not transferred back to the pharmacy, but rather to the food department, which, although perhaps preferable to the parking lot, could still rationally have been found by the jury to be worse than the pharmacy.

Because we find that Appellee presented sufficient evidence for the jury to find a specific adverse employment action, we need not reach his alternative claim that Appellants created a hostile work environment.

### C. Failure to Accommodate Claim

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); *accord* 29 C.F.R. § 1630.9(a). Appellants argue that, because Brady never requested an accommodation and testified that he did not think he needed one, the district court should have granted judgment as a matter of law on the failure to accommodate claim.

-11-

Appellants also argue that Brady did not demonstrate the existence of an accommodation that would have enabled him to perform his job.

"[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Graves v. Finch Pruyn & Co.,* 457 F.3d 181, 184 (2d Cir. 2006) (emphasis added) (internal quotation marks omitted). Over the defense's objections, Judge Orenstein charged the jury that, if "Wal-Mart knew or had reason to know that Mr. Brady had a disability, or perceived that made it difficult [*sic*] to perform his job as a sales associate in the pharmacy, or perceived that he had such a disability," then it had an obligation to offer a reasonable accommodation.

We have not had occasion in the past to determine when the "general[]" rule announced in *Graves* might be inapplicable. Appellee relies on district court cases to argue that the employer is obligated to provide a reasonable accommodation when it perceives the employee to be disabled, whether or not the employee has asked for an accommodation. In *Felix v. New York City Transit Authority*, 154 F. Supp. 2d 640 (S.D.N.Y. 2001), the district court wrote that,

> Application of this general rule [that a request for accommodation is a prerequisite to liability for failure to accommodate] is not warranted, however, where the disability is obvious or otherwise known to the employer without notice from the employee. The notice requirement is rooted in common sense. Obviously, an employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability. Moreover, the notice requirement prevents an employee from keeping her disability a secret and suing later for failure to accommodate. These concerns are not relevant when an employer has independent knowledge of an employee's disability. The rule requiring a request for accommodation [does not apply] in such circumstances.

*Id*. at 657 (internal citations omitted); *accord Glozman v. Retail, Wholesale & Chain Store Food Employees Union Local 338*, 204 F. Supp. 2d 615, 623 (S.D.N.Y. 2002). This view is consistent

with the statutory and regulatory language, which speaks of accommodating "known" disabilities, not just disabilities for which accommodation has been requested. Indeed, a situation in which an employer perceives an employee to be disabled but the employee does not so perceive himself presents an even stronger case for mitigating the requirement that the employee seek accommodation. In such situations, the disability is obviously known to the employer, while the employee, because he does not consider himself to be disabled, is in no position to ask for an accommodation. A requirement that such an employee ask for accommodation would be tantamount to nullifying the statutory mandate of accommodation for one entire class of disabled (as that term is used in the ADA) employees. We therefore hold that an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled.

But what does accommodation mean, if the employee does not request specific accommodation? We have held that the ADA contemplates that employers will engage in "an 'interactive process' [with their employees and in that way] work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000). In this case, it was reasonable for the jury to find that Brady was disabled and/or that Appellants perceived him to be disabled. Accordingly, Wal-Mart was obligated to engage in the aforementioned interactive process. Wal-Mart failed to engage in this process, and therefore the district court was correct in declining to grant judgment as a matter of law on the failure to accommodate claim.

-13-

### D. Consent Decree

At the time of Brady's employment and throughout this litigation, Wal-Mart was subject to a nationwide consent decree pursuant to *EEOC v. Wal-Mart Stores, Inc.*, No. S99 CIV 0414, 2001 WL 1904140 (E.D. Cal. Dec. 17, 2001). The consent decree required Wal-Mart, *inter alia*, not to engage in any employment practice that would violate the ADA, to train Wal-Mart employees in ADA compliance, and to formulate accurate job descriptions that are consistent with actual job requirements. *Id*. The district court allowed Brady to introduce into evidence a redacted version of the consent decree "for the limited purpose of showing that Wal-Mart was aware of its obligations under the ADA." *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d at 179. Appellants argue that the consent decree was irrelevant and prejudicial because Wal-Mart was not on trial for violating the consent decree, and that a new trial is the proper remedy.

The trial court's evidentiary rulings are reviewed only for abuse of discretion. *See, e.g., Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997). A consent decree may properly be admitted to demonstrate that a defendant was aware of its legal obligations. *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981). The district judge here instructed the jury that "the only fact you should take into consideration about the . . . consent decree . . . is that Wal-Mart undertook certain obligations. It has nothing to do with this case and what preceded it. Just that they had these obligations they agreed to. And that is the only purpose that those obligations that are being referred to are admitted in evidence." In short, the court instructed the jury that it could consider the consent decree only as an implicit acknowledgment by Wal-Mart that it was familiar with the ADA. Given this limiting instruction, we cannot find that the district court abused its discretion in admitting the consent decree. *See United States v. Downing*, 297 F.3d 52, 59 (2d

Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions."). We moreover find that it was not an abuse of discretion for the district court to determine that Appellee's arguments in summation regarding Appellants' violation of the decree were justified by Appellants' own arguments that the decree demonstrated that "Wal-Mart was doing the right thing" with regard to disabled employees. A new trial is therefore unwarranted.

### E. Pre-Employment Inquiry

Appellee claims that Wal-Mart's pre-employment inquiry as to whether he could carry fifty-pound boxes while climbing a ladder violated the requirement that pre-employment medical inquiries be narrowly tailored to the job for which the applicant is applying, *see* 29 C.F.R. § 1630 app. Appellants reply that, because Appellee answered that he was able to perform the job, and because he was hired, he has no standing to make this claim. The question is a close one. *See Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (stating that "a plaintiff need not prove that he or she has a disability unknown to his or her employer in order to challenge a medical inquiry or examination" under a similar statutory provision); *but see O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) (requiring an "injury-in-fact" for standing to challenge a pre-employment inquiry under the ADA); *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 519-20 (3d Cir. 2001) (similar); *Cossette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999) (similar); *Griffin v. Steeltek*, 160 F.3d 591, 595 (10th Cir. 1998) (similar); *Armstrong v. Turner Indus.*, 141 F.3d 554, 562 (5th Cir. 1998) (similar).

But we need not take a stand on the matter today. It is manifest that the damages ultimately awarded would have been the same regardless of the position we took on this question. The court, well within its discretion, assigned all of the compensatory damages to the state law claims, which were not based on the pre-employment inquiry. The jury awarded punitive damages of $5 million; these were reduced to the statutory cap of $300,000. The jury awarded $4.5 million in punitive damages on the basis of discrimination alone. Hence we can say without fear of peradventure that all of the damages awarded, which we affirm *infra*, were attributable to other behavior on the part of Appellants.

### F. Punitive Damages

Appellants assert that Appellee failed to present sufficient evidence to justify an award of punitive damages. An award of punitive damages in an ADA case requires a showing "that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). In other words, for punitive damages to be awarded, Brady had to show that Wal-Mart "discriminate[d] in the face of a perceived risk that its actions w[ould] violate federal law." *Id*. at 536. There was ample evidence of such a perceived risk here to justify the award of punitive damages.

## G. Remittitur

Because the compensatory damages were allocated entirely to the state law claim, the remittitur is evaluated under state law. Appellants assert that the district court improperly evaluated its remittitur application under the standard set forth in *New York City Transit Authority v. State Division of Human Rights*, 78 N.Y.2d 207, 219 (N.Y. 1991), rather than the standard laid out in section 5501(c) of the New York Civil Practice Law and Rules. Under the statutory provision, a compensatory damages award is excessive "if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). In *Transit Authority*, the New York Court of Appeals identified three factors to be considered in reviewing mental anguish compensatory damages awarded by the State Commissioner of Human Rights in a discrimination case: "whether the relief was reasonably related to the wrongdoing, whether the award was supported by evidence before the Commissioner, and how it compared with other awards for similar injuries." *N.Y. City Trans. Auth.*, 78 N.Y.2d at 219.

The district court here wrote that,

> Whether I analyze it under the "deviates materially" standard of § 5501(c) or the more nuanced approach of *Transit Authority*, I cannot sustain the jury's award of $2.5 million as compensation for Brady's emotional distress. With respect to § 5501(c), the award does deviate materially from other awards that the parties have cited . . . . And under the *Transit Authority* analysis, the third prong—requiring a comparison to other awards—compels a similar result.

*Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d at 198. The court, however, did "discern at least some daylight, if not much, between 'deviates materially' and the standard that applies under the NYHRL." *Id*. at 196. The court then determined the magnitude of the remittitur by reference to three state cases. *See id.* at 201. Each of these cases was decided after *Transit Authority*. *See*

-17-

*Tiffany & Co. v. Smith*, 638 N.Y.S.2d 454, 454 (App. Div. 1996); *Sogg v. Am. Airlines, Inc.*, 603 N.Y.S.2d 21, 27-28 (App. Div. 1993); *Cavagnuolo v. Baker & McKenzie*, No. 1B-E-D-86-115824, 1993 WL 766865, at *9 (N.Y. Div. of Human Rights Dec. 17, 1993).  The district court used those cases to help it identify "the greatest amount that would not be excessive."  *Brady Wal-Mart Stores, Inc.*, 455 F. Supp. 2d at 201.

We think it is uncertain which of the two standards the district court used in determining the amount of the remittitur.  Its citations do not clarify the matter: two of the cases (*Tiffany & Co.* and *Sogg*) appear to use the "deviates materially" standard, while the third (*Cavagnuolo*) appears to use the *Transit Authority* standard.  We believe that *Transit Authority* states the applicable law of New York.[2]  We note, moreover, that the *Transit Authority* standard is more favorable to plaintiffs than the statutory standard.  Therefore, either the district court correctly applied the *Transit Authority* standard, or it erred in a way that harmed Appellee—by applying the "deviates materially" standard—but Appellee has not protested.  Either way, there is no cause for remand.

Therefore, the judgment of the district court is AFFIRMED.

---

[2] In *Cross v. New York City Transit Authority*, 417 F.3d 241, 258 (2d Cir. 2005), this Court applied the "deviates materially" standard.  However, that case did not present the question of whether the "deviates materially" standard or the *Transit Authority* standard applied.