William GLASER, Plaintiff,

v.

GAP INC. and Milinda Mejorado,
Defendants.

No. C11–6679 TSZ.

United States District Court,
S.D. New York.

Jan. 31, 2014.

Helen G. Ullrich, Stephen Bergstein, Bergstein & Ullrich, LLP, Chester, NY, for Plaintiff.

Andriette Aleigha Roberts, Melissa C. Rodriguez, Morgan, Lewis & Bockius LLP, New York, NY, for Defendants.

## ORDER

THOMAS S. ZILLY, District Judge.

THIS MATTER comes before the Court on a motion for summary judgment, docket no. 36, brought by defendants Gap Inc. ("Gap") and Milinda Mejorado. Having reviewed all papers filed in support of and in opposition to the motion, the Court enters the following order.

### Background

Plaintiff William Glaser suffers from au-

tism.[1] He is currently 37 years of age. Pla. 56.1 Stmt. at ¶ 1 (docket no. 44). For over seven years, Glaser worked for Gap as a merchandise handler at a distribution center in Fishkill, New York. Ex. 76 to Roberts Aff. (docket no. 45–82). Glaser was terminated from this position on November 6, 2009. *Id.* For approximately eleven months prior to his discharge, Glaser was supervised by defendant Mejorado. Def. 56.1 Stmt. at ¶ 107 (docket no. 38).

On the day before his discharge, November 5, 2009, Glaser approached Mejorado and requested a new "fish knife," a plastic device shaped like a fish that is used to cut tape and open boxes. Pla. 56.1 Stmt. at ¶ 92 (docket no. 44); Ex. P6 to Ullrich Aff. (docket no. 47–6). According to Glaser, after Mejorado handed him the fish knife, he put the device in his back pocket. Glaser Dep. at 1116:14–24 (docket no. 47–14 at 17). Glaser then asked to speak with Mejorado, indicating that he wished to apologize about an incident that occurred a few days earlier. *Id.* at 1113:4–6. In his deposition, Glaser testified that Mejorado began yelling at him. *Id.* at 1113:12–24.

At the time, Glaser and Mejorado were in a cubicle assigned to Katie Connolly. Ex. 67 to Roberts Aff. (docket no. 45–73). Connolly was present, and later signed a written statement indicating that, during the conversation, Glaser was waving his hands and continually moving into the cubicle. *Id.* Connolly perceived that Glaser was doing so to prevent Mejorado and her from leaving the cubicle. *Id.* Connolly, however, agreed with Glaser's account that, when she indicated to him that she and Mejorado needed to go to a meeting, Glaser immediately left the area. *Id.;* Glaser Dep. at 1114:5–19. Although Connolly described Glaser as agitated, she made no mention of any threatening words or gestures. *See* Ex. 67 to Roberts Aff.

Two other Gap employees were in the vicinity and overheard the interaction between Glaser and Mejorado. Dorothy Singleton and Ellen Roush indicated in their respective statements that Glaser blocked Mejorado into Connolly's cubicle by stretching out his arms. Exs. 69 & 70 to Roberts Aff. (docket nos. 45–75 & 45–76). Roush observed Glaser clench and unclench his fists. Roush Decl. at ¶ 6 (docket no. 39). According to Roush, when Connolly mentioned the meeting that she and Mejorado needed to attend, Glaser's demeanor changed, and he moved away from the cubicle, saying hello to both Singleton and Roush on his way past them. Ex. 70 to Roberts Aff.

Mejorado's initial version of the incident essentially mirrored those of Connolly, Singleton, and Roush, none of whom placed a knife in Glaser's hand. *See* Ex. 68 to Roberts Aff. (docket no. 45–74). At her deposition on August 14, 2012, however, Mejorado accused Glaser of "clenching onto the knife." Mejorado Dep. at 211:15–16 (docket no. 47–20). She repeated in her declaration that she "observed Plaintiff clenching his fish knife in one hand." Mejorado Decl. at ¶ 27 (docket no. 41).

The documents prepared contemporaneously with Glaser's discharge, namely a Termination Summary, Ex. 71 to Roberts Aff. (docket no. 45–77), and an Employee Relations Call Document, Ex. 72 to Roberts Aff. (docket no. 45–78), make no mention of a knife. In her deposition, however, Human Resources Business Leader Karen Hoffman, one of the two decisionmakers in this case, *see* Def. 56.1 Stmt. at ¶ 187 (docket no. 38), referred to a "box

---

1. Defendants do not dispute that Glaser has autism, but they raise issues concerning the timing of his diagnosis.

knife" being in Glaser's hand; she could not remember who provided such information, and she could not remember whether she spoke with Connolly, Roush, or Singleton before she discharged Glaser. Hoffman Dep. at 68:3–18, 70:12–23 (docket no. 47–21). Glaser was fired on November 6, 2009, via a telephone call conducted by Hoffman and Craig Brown; he was terminated without being interviewed about his version of events. Ex. 72 to Roberts Aff.

Glaser commenced this lawsuit against Gap and Mejorado in September 2011, within 90 days after receiving a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC"). Compl. at ¶ 7 (docket no. 1). In this action, Glaser brings the following claims under both the Americans with Disabilities Act ("ADA"), as amended effective January 1, 2009, *see* ADA Amendments Act of 2008 ("ADAAA"), Pub.L. 110–325, § 8, 122 Stat. 3553, 3559 (2008), and the New York State Human Rights Law ("NYSHRL"): (i) failure to accommodate; (ii) hostile work environment; (iii) failure to train managers; and (iv) discriminatory discharge. Compl. at ¶¶ 85–88. In addition, under the NYSHRL, Glaser alleges an "aid and abet" claim against Mejorado. *Id.* at ¶¶ 89–91. Defendants move for summary judgment.[2]

**Analysis**

**A.  Summary Judgment Standard**

The Court shall grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn. *Id.* at 255, 257, 106 S.Ct. 2505. If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

**B.  Discrimination**

Under both the ADA and the NYSHRL, disability discrimination claims are governed by the three-part burden-shifting analysis first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Wesley–Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F.Supp.2d 386, 401–02, 2013 WL 5338516 at *12 (S.D.N.Y. Sep. 24, 2013). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action at issue. If the defendant is able to do so, the burden shifts back to the plaintiff to show that the defendant's reason is merely a pretext for discrimination.

**1.  Prima Facie Case**

With regard to the elements of a prima facie case, the ADA and the NYSHRL have been interpreted differently. Under the ADA, a prima facie case

---

**2.**  Defendants have presented no argument relating to the hostile work environment and failure to train claims, and this Order will not address those claims. To the extent that defendants move for summary judgment on those claims, the motion is DENIED.

requires a showing that (i) the defendant employer is subject to the ADA, which is undisputed here; (ii) the plaintiff is disabled within the meaning of the ADA or was perceived to be so by the defendant employer; (iii) the plaintiff was otherwise qualified to perform the essential functions of the job either with or without reasonable accommodation, which is also undisputed in this case; and (iv) the plaintiff suffered an adverse employment action because of his or her disability. *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir.2008). Under the NYSHRL, however, the plaintiff must show only that (i) he or she suffers from a disability; and (ii) the disability caused the behavior for which he or she was terminated. *Miloscia v. B.R. Guest Holdings LLC*, 33 Misc.3d 466, 928 N.Y.S.2d 905, 912 (N.Y.Sup.Ct. 2011) (citing *Matter of McEniry v. Landi*, 84 N.Y.2d 554, 620 N.Y.S.2d 328, 644 N.E.2d 1019 (1994)).

### a. *Disability*

■ With regard to Glaser's ADA claim of wrongful discharge, defendants contend that Glaser cannot present a prima facie case because he is not disabled under the ADA's definition, which requires that a physical or mental impairment "substantially" limit one or more "major life activities." 42 U.S.C. § 12102. Defendants do not present a similar argument under the NYSHRL. The NYSHRL provides broader protection than the ADA. *Phillips v. N.Y.C.*, 66 A.D.3d 170, 884 N.Y.S.2d

369, 373 (2009). Rather than inquiring whether an impairment "substantially limits" a "major life activity," *see id.* at n. 3, the NYSHRL defines disability as (i) "a physical, mental or medical impairment resulting from anatomical, physiological or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques," (ii) "a record of such an impairment," or (iii) "a condition regarded by others as such an impairment." N.Y. Exec. Law § 292(21) (McKinney 2012). Defendants make no showing of either an absence of any genuine issue of material fact or an entitlement to judgment as a matter of law concerning whether Glaser is disabled within the meaning of the NYSHRL. *See* Fed.R.Civ.P. 56(a). Thus, for purposes of further analyzing the merits of Glaser's claim of discriminatory discharge in violation of the NYSHRL, the Court will assume that Glaser has the requisite mental impairment resulting from a physiological or neurological condition demonstrable by medically accepted clinical or diagnostic techniques.[3] *See* N.Y. Exec. Law § 292(21).

Turning to defendants' assertion that Glaser is not disabled under the ADA's more rigorous standard, the Court concludes defendants have failed to satisfy the prerequisites for summary judgment. Defendants cite two cases for the proposition that Glaser's ability to "interact with oth-

---

**3.** Since early childhood, Glaser has had difficulty with language. D. Glaser Aff. at ¶ 3 (docket no. 53). Throughout his school years, Glaser was placed in special education classes, and he "aged out" of the public education system when he turned 21. *Id.* at ¶ 4. Before hiring Glaser, Gap was aware that Glaser had been in special education classes; he indicated this fact on his employment application. *See* Ex. 15 to Roberts Aff. (docket no. 45–21). Although Glaser can read num-

bers, he cannot interpret them, and he is therefore unable to tell time. Abelove Decl. at ¶ 8 (docket no. 47–24). In addition, Glaser has "limited cognitive abilities" that might lead to "misunderstandings and inappropriate responses in interacting with other people." *Id.* Such responses might include physical manifestations of anxiety, which are described by plaintiff's expert Laurence Abelove, Ph.D. as "easily observable signs of bodily tension." *Id.* at ¶ 6.

ers" is not sufficiently limited to qualify him as disabled under the ADA, namely *Jacques v. DiMarzio, Inc.*, 386 F.3d 192 (2d Cir.2004), and *McElwee v. County of Orange*, 2011 WL 4576123 (S.D.N.Y. Sep. 30, 2011), *aff'd on other grounds*, 700 F.3d 635 (2d Cir.2012). *Jacques*, however, was decided before the ADA was amended in 2008 by the ADAAA, and the holding of *Jacques* is undermined by such legislation.[4] Defendants' reliance on the district court's decision in *McElwee* is similarly misplaced. In *McElwee*, the Second Circuit noted that the definition of "disability" had been amended by the ADAAA, and indicated that the plaintiff and *amici curiae* had raised "fair concerns" as to whether the district court had erred.[5] *See* 700 F.3d at 642–43.

The ADAAA, which was enacted after *Jacques* and which took effect before Glaser was terminated by Gap, drastically altered the manner in which the phrases "substantially limit" and "major life activity" should be construed. The legislation

was principally aimed at unwinding judicial decisions that had improperly narrowed the scope of protection under the ADA. *See* Pub.L. 110–325, § 2, 122 Stat. at 3553–54. Congress specifically rejected the concept that, to qualify as disabled, an individual must have an impairment that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at § 2(b)(4) (quoting *Toyota Motor Mfg., KY., Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)). Congress further clarified that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," and that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* at § 2(b)(5). Consistent with these pronouncements, the ADAAA indicates that the definition of disability "shall be construed in favor of broad coverage ... to

4. In *Jacques*, the Second Circuit considered whether "interacting with others" constitutes a "major life activity" within the meaning of the ADA's definition of disability as "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1). After concluding that "interacting with others" is a "major life activity," the *Jacques* Court establish a high threshold for finding that such major life activity is "substantially" limited, requiring a showing that the impairment "severely limits the fundamental ability to communicate with others," *i.e.*, impedes the ability "to initiate contact with other people and respond to them, or to go among other people ? at the most basic level of these activities." 386 F.3d at 203. In adopting this standard, the Second Circuit sought to distinguish between (i) those who have at least a rudimentary ability to interact with others, but whose communication is "inappropriate, ineffective, or unsuccessful," *id.*, and (ii) those who experience "isolation resulting from ... [a] severe condition[], including acute or profound cases of

... autism, agoraphobia, depression," or other disorders, *id.* at 203–04, and are properly considered disabled.

5. Relying on *Jacques*, the district court in *McElwee* held that "no reasonable jury" could find the "fundamental limitations on the ability to communicate with others on the basic level" required to deem the plaintiff disabled for purposes of his claims under Title II of the ADA and Section 504 of the Rehabilitation Act of 1973. 2011 WL 4576123 at *6. The district court concluded that, although the plaintiff's problems were significant, they involved "the subjective quality of the communication" rather than the core question of whether he had the ability to communicate and interact with others. *Id.* at *7 (citing *Bell v. Gonzales*, 398 F.Supp.2d 78, 88 (D.D.C. 2005)). On appeal, the Second Circuit concluded that it need not decide whether the district court erred in finding the plaintiff was not disabled because the plaintiff's Title II and § 504 claims otherwise lacked merit. 700 F.3d at 643–46.

the maximum extent permitted" under the ADA, and that the phrase " 'substantially limits' shall be interpreted consistently with the findings and purposes" of the ADAAA. 42 U.S.C. § 12102(4)(A) & (B).

The regulations implementing the ADAAA provide that " 'substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). They further state that an impairment constitutes a disability if "it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," but the impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity" to be considered substantially limiting. *Id.* at § 1630.2(j)(1)(ii). According to the regulations, applying the principles set forth therein, the conclusion should "easily" be drawn that certain enumerated impairments "will, at a minimum, substantially limit the major life activities indicated." *Id.* at § 1630.2(j)(3)(iii). Among the impairments listed in the regulations is "autism," which the regulations specifically state "substantially limits brain function." *Id.* Autism, as well as the other enumerated impairments, might also substantially limit major life activities other than those explicitly identified in the regulations. *Id.*

▪ Applying the ADAAA and the regulations promulgated pursuant to the ADAAA, the Court concludes that Glaser has raised a genuine issue of material fact regarding whether he is disabled for purposes of his wrongful discharge claim under the ADA. While employed by Gap, Glaser received negative feedback on more than one occasion about his interaction with a coworker. According to Gap, in April 2005, a coworker complained that Glaser made her feel uncomfortable by getting upset if she was too busy to speak with him when he stopped by to see her

and by talking about her to other people in too familiar a manner. Def. 56.1 Stmt. at ¶ 85 (docket no. 38); *see* Ex. 34 to Roberts Aff. (docket no. 45–40). Gap's records indicate that Glaser was coached or counseled about this behavior. Ex. 34 to Roberts Aff. In November 2008, in response to a complaint by a member of the loss prevention staff, Glaser was told that, if he arrived before his shift (Glaser was routinely at the worksite about two hours early), he should not speak with coworkers who are on duty because doing so is distracting to them, and he should instead go to the cafeteria and read a newspaper. Def. 56.1 Stmt. at ¶ 130 (docket no. 38); *see* Ex. 58 to Roberts Aff. (docket no. 45–64).

In August 2009, Glaser was advised that he needed to refrain from putting his arm around his supervisor, Mejorado, or placing his hands on her when speaking with her, and that he needed to stand further apart from others when he talked to them. Def. 56.1 Stmt. at ¶ 139 (docket no. 38); *see* Ex. 61 to Roberts Aff. (docket no. 45–67). In response to this feedback from Joelle Virgilio and other human resources ("HR") personnel, Glaser indicated that he would not have contact with Mejorado unless required for work-related issues. Ex. 61 to Roberts Aff. In a written summary prepared by Virgilio, she noted her concern that Glaser, in attempting to comply with the "counseling" he had received, might completely avoid communication with his supervisors, and Virgilio indicated that she would monitor the situation. *Id.*

Given the frequent "coaching" on the subject, defendants cannot seriously argue that Glaser's ability to "interact with others" was not impaired. Instead, defendants contend that Glaser's impairment does not rise to the level of a "substantial" limitation. Defendants' arguments, how-

ever, merely raise genuine issues of material fact.

### b. *Adverse Action Because of Disability*

■ Defendants also contend that Glaser cannot establish a prima facie case of wrongful termination because he cannot demonstrate that his discharge was "because of" his disability. With regard to his claim under the NYSHRL, Glaser need not make such showing. Rather, under the NYSHRL, Glaser's prima facie burden is to offer evidence indicating that his disability caused the behavior for which he was fired. *McEniry*, 620 N.Y.S.2d 328, 644 N.E.2d at 1021.[6] Glaser has at least raised a genuine issue of material fact on this issue, and defendants present no argument to the contrary. To the extent that, as asserted by Gap, the basis for Glaser's discharge was his interaction with Mejorado on November 5, 2009, Glaser is entitled, as the non-moving party, to the reasonable inference that his described behavior, namely clenching his fists and impeding Mejorado's egress from another individual's cubicle, *see* Ex. 74 to Roberts Aff. (docket no. 45–80), was a product of his disability.

Gap trainer Richard Buckner testified that, when Glaser would get upset, he would turn red, tense up, clenching his fists against his chest, and tremble. Buckner Dep. at 226:19–227:11 (docket no. 47–16). Buckner never interpreted this behavior as violent or threatening in any way. *Id.* at 227:12–15. Buckner viewed Glaser as an "autistic-type person." *Id.* at 133:19–20. Buckner called Glaser "Rainman," referencing the title of a movie and the nickname of an autistic character portrayed by Dustin Hoffman, because Glaser exhibited similar traits. *Id.* at 225:11–21. Virgilio made similar observations. *See* Virgilio Dep. at 111:8–24 (docket no. 47–17) (Glaser "was very upset whenever he received any type of counseling or correction action." He would "always turn red. He always clenched his fists."). Given the evidence linking Glaser's disability to the conduct on which Gap allegedly relied in firing him, *see* Abelove Decl. at ¶ 6 (docket no. 47–24) (Glaser displays "physical clues" like "easily observable signs of bodily tension" that indicate he is anxious and/or does not understand what is being said), defendants' assertion that Glaser has not made out a prima facie case under the NYSHRL lacks merit.

With respect to Glaser's ADA claim, defendants argue that they had no notice of Glaser's autism and therefore could not have discharged him "because of" his disability. As explained further below, defendants' analysis is flawed for three reasons. First, Gap's assertion that it did not know about Glaser's impairment (as opposed to his diagnosis) is belied by the deposition testimony of its own personnel. Second, the declarations of Glaser and his assigned job developer Sheree Hughes raise genuine issues of material fact concerning what Gap knew and when. Third, defendants' contention that, in the absence of a formal diagnosis of autism, which was not made until after Glaser initiated this lawsuit,

---

**6.** In *McEniry*, the New York Court of Appeals held that the plaintiff, who suffered from the disability of alcoholism, had established a prima facie case of wrongful discharge under the NYSHRL by presenting evidence that his chronic absenteeism, for which he was terminated, was caused by his alcoholism. 620 N.Y.S.2d 328, 644 N.E.2d at 1021–22. Because the plaintiff had set forth a prima facie case, the burden shifted to his employer to show that the plaintiff's "disability render[ed] him incapable of 'performing in a reasonable manner the activities involved in the job.'" *Id.*, 620 N.Y.S.2d 328, 644 N.E.2d at 1022. Having failed to do so, the *McEniry* Court held that the plaintiff was entitled to "reinstatement ... with back pay and other benefits due." *Id.*

they could not have discriminated against Glaser on the basis of his disability runs contrary to the ADA itself.

From the outset, Gap personnel apparently understood that Glaser is impaired. While serving as Glaser's trainer, and having observed that Glaser was "different" and probably suffered from "a mental disability," Buckner discussed the situation with various Gap supervisors, who told Buckner to "keep an eye on" and help Glaser and to "[m]ake sure nobody bothered him." Buckner Dep. at 113:8–18, 137:6–24 (docket no. 47–16). When Glaser got upset, Buckner was asked by Gap supervisors to talk to him and "calm him down." *Id.* at 229:10–12, 230:9–11. Buckner mentioned to at least three Gap supervisors that Glaser would fixate on and not be able to solve a problem, *id.* at 238:9–16, and he spoke with at least one Gap manager about Glaser's tendency to follow people around and get too close, *id.* at 236:7–17.

Virgilio, who began working for Gap in 2008, perceived that Glaser had difficulty communicating and socializing in ways similar to her own son, who is autistic. Virgilio Dep. at 25:2–9, 51:18–22, 62:9–23 (docket no. 47–17). Indeed, Virgilio had wanted to initiate an "ADA process" for Glaser, *id.* at 51:10–13, and she discussed the concept with the Campus HR Manager (either Barbara Munoz or Mark O'Hanlon), *id.* at 51:23–52:20, but according to Virgilio, it did not occur because Glaser "emphatically denied" needing assistance, *id.* at 53:3–5. Glaser disputes that Virgilio ever asked him to participate in an "ADA process," and he states that he has "always been willing to accept help." Glaser Aff. at ¶ 13 (docket no. 47–22).

Glaser indicates that, throughout his tenure at Gap, he told supervisors about his disabilities as best he could. *Id.* at ¶ 11. He disclosed his inability to tell time, count, or perform mathematics, which were the symptoms of relevance to him and of which he was aware. *Id.* at ¶ 12. In his deposition, Glaser testified that he informed Mejorado about these disabilities, although he did not know whether the conversation occurred before or after she became his supervisor and that, in response, Mejorado "became quite uncomfortable about the situation" and thereafter would avoid him. Glaser Dep. at 213:2–214:24 (docket no. 47–8). Glaser further stated that, if he asked Mejorado for help, she would gesture with her hand and tell him to "go and talk with another supervisor." *Id.* at 214:25–215:6. At one point, Glaser expressed concern to Mejorado about an upcoming shift to daylight savings time; he was worried that, because of his disabilities, he might come to work at the wrong time. *Id.* at 892:3–16. According to Glaser, Mejorado replied, "Do me a favor, go get your f——ing watch fixed." *Id.* at 892:17–18. Although Mejorado denies making this remark, Mejorado Decl. at ¶ 12 (docket no. 41), the Court must, in deciding the pending motion for summary judgment, accept as true Glaser's version of events. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

According to Glaser, when he interviewed for the position at Gap, he requested and was told that he could not have a job coach or retention specialist, and he therefore signed a form declining those services from Vocational and Educational Services for Individuals with Disabilities ("VESID"), an agency of the New York State Department of Education. Glaser Aff. at ¶ 6 (docket no. 47–22); Hughes Decl. at ¶ 1 (docket no. 47–23). Hughes, who works for Abilities First, Inc., one of VESID's subcontractors, accompanied Glaser to his interview with Gap. Hughes Decl. at ¶¶ 1, 11–12. According to Hughes, she introduced herself to the Gap recruiter, giving him her business card,

and explained that VESID could provide a job coach for Glaser. *Id.* at ¶ 12. The Gap recruiter did not permit Hughes to be present during Glaser's interview, and indicated that, if Glaser required assistance to perform the job, then he probably would not receive an offer. *Id.* at ¶ 13. The Gap recruiter was nevertheless aware, before hiring Glaser, that Glaser was eligible for VESID services; Gap has offered no evidence to the contrary.[7]

Given the record, defendants' contention that Glaser cannot show his discharge was "because of" his disability, and thus cannot establish a prima facie case under the ADA, lacks merit. Under the ADA, an employer need not know the exact diagnosis to be liable for discrimination on the basis of a disability; liability may be premised on the employer's perception, regardless of whether it is accurate, if the employer relies on such perception to engage in a prohibited act. *See* 42 U.S.C. § 12102(1)(C); 29 C.F.R. 1630.2(g)(3) & (P); *see also Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir.2008) (holding that the evidence supported the jury's

finding that the ADA plaintiff was regarded as disabled by his supervisor, who herself testified that "she 'knew there was something wrong' with him" and to whom was attributed the statement that the plaintiff "wasn't fit for the· job"). Glaser has raised triable issues concerning whether defendants regarded him as disabled even though they were not formally advised of his autism.[8] To the extent defendants contend that Glaser's termination was not "because of" such perception, such argument is more appropriately addressed in connection with Gap's burden to articulate a legitimate, non-discriminatory reason for the adverse employment action. The Court concludes that Glaser has proffered enough evidence to survive summary judgment as to his prima facie case of discriminatory discharge under both the ADA and the NYSHRL.

### 2. *Reason for Termination/Pretext*

The burden now shifts to defendants, who contend that Glaser was fired because he violated Gap's "Zero Means Zero" and "Workplace Violence" policies. The "Zero

---

7. Gap has not identified the recruiter who interviewed Glaser, and has not provided a declaration contradicting Glaser's and Hughes's accounts of the conversations with the Gap recruiter. John Cronin, an HR manager for Gap, states that Glaser, "[u]pon commencing his employment," did not request a job coach. Cronin Decl. at ¶ 7 (docket no. 40). Cronin and another HR manager further indicate that Gap's records do not reflect a request by Glaser for a job coach. *Id.* at ¶¶ 6 & 8; Hartwell Decl. at ¶¶ 7–9 (docket no. 42). These HR managers, however, do not even address whether Glaser made such request during his interview, as opposed to after "commencing" employment.

8. Defendants contend that Glaser failed to exhaust his ADA claim because he did not disclose his autism to the EEOC. Glaser, however, informed the EEOC that he has "language disability, learning disability, can't do math, I am dyslexic, and have neuroligal [sic]

impairment and need help in time to learn." *See* Ex. 76 to Roberts Aff. (docket no. 45–82 at 5). Glaser's attorney prepared a complaint, which was signed by Glaser and filed with the EEOC, indicating that Glaser has "a neurological impairment which creates a learning and language disability." Ex. 77 to Roberts Aff. (docket no. 45–83 at 2). The complaint further explained that Glaser's disability "makes it hard for [him] to process language and to choose the appropriate words with which to communicate, particularly when [he is] under stress." *Id.* The complaint also disclosed that Glaser is "largely incapable of performing any math functions and cannot process before/after sequencing." *Id.* The Court is satisfied that Glaser exhausted his ADA claim by advising the EEOC about his specific impairments, rather than providing a label or diagnosis that might encompass a range of symptoms, some of which he might not have.

Means Zero" policy indicates that "Gap Inc. has zero tolerance for discrimination or harassment." Ex. 12 to Roberts Aff. (docket no. 45–18 at 6). Harassment is defined in the policy as including "slurs and any other offensive remarks, jokes and other verbal, graphic, or physical conduct that could create an intimidating, hostile or offensive work environment." *Id.* The only reference in the "Zero Means Zero" policy to the act of "blocking" another's movement is contained within the description of sexual harassment, at the end of a list of improper activities, which include offering employment benefits in exchange for sexual favors and threatening reprisals after a negative response to sexual advances. *Id.* The "Workplace Violence" policy states that "Gap Inc. does not tolerate workplace violence, threats or intimidation against employees by anyone, including customers, vendors and other employees." *Id.* (docket no. 45–18 at 7). The enumerated examples of prohibited conduct are: threats or acts of violence, hitting or shoving, carrying a weapon or pointing a weapon while on company property, threatening family members, friends, or associates, destruction of property, harassing or threatening calls, stalking, and suggesting that violence is appropriate. *Id.* (docket no. 45–18 at 7–8).

■ Defendants provide no analysis of how Glaser violated these policies. No allegation was made that Glaser used any improper words or made any threats. According to the contemporaneous statements, Glaser did not engage in any act of violence, as defined in the "Workplace Violence" policy and, to the extent he "blocked" Mejorado in Connolly's cubicle, his behavior did not have the type of sexual undertone that would bring it within the ambit of the "Zero Means Zero" policy. Moreover, with regard to Mejorado's more recent assertion that Glaser held a knife

during the incident, Glaser is entitled, as the non-moving party, to the reasonable inference that Mejorado either misremembers or has fabricated that fact, which is not corroborated by any other witness or by the records relating to Glaser's termination. Defendants' motion for summary judgment is DENIED with respect to Glaser's discriminatory discharge claims under the ADA and the NYSHRL.

## C. *Accommodation*

The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so would "impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). The Second Circuit has interpreted this provision of the ADA to impose on employers a duty to reasonably accommodate an employee's disability if the employer knows or reasonably should know that the employee is disabled. *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 135 (2d Cir.2008). In Brady, the plaintiff, who had cerebral palsy, was hired for a part-time position in Wal–Mart's pharmacy, but he was quickly transferred to a parking lot job, collecting shopping carts and garbage. *Id.* at 130–31. After expressing dissatisfaction with this perceived demotion, the plaintiff was transferred to the food department, where he was given a work schedule that conflicted with his community college classes, about which he had informed the store when he was hired. *Id.* at 132. In frustration, he quit. *Id.*

The jury in *Brady* found that Wal–Mart discriminated against the plaintiff on the basis of his disability by transferring him to the parking lot position, and that Wal–Mart failed to reasonably accommodate the plaintiff. *Id.* Although the plaintiff did not receive economic damages because the

jury concluded he was not constructively discharged, he was awarded significant compensatory and punitive damages, and Wal–Mart appealed, arguing *inter alia* that, because the plaintiff never requested an accommodation and at trial testified that he did not think he needed one, the district court should have granted judgment as a matter of law on the failure to accommodate claim. *Id.* at 132–34.

The Second Circuit disagreed. The *Brady* Court observed that the statutory and regulatory language "speaks of accommodating 'known' disabilities, not just disabilities for which accommodation has been requested." *Id.* at 135. According to the Second Circuit, when an employer regards an employee as disabled, but the employee does not have a similar perception, an even stronger case exists for foregoing the requirement that the employee seek accommodation. *Id.* To hold otherwise would nullify the statutory mandate of accommodation for an entire class of disabled employees. *Id.* The Second Circuit therefore imposed a duty to reasonably accommodate an employee's disability if the employer knows or reasonably should know that the employee is disabled. *Id.* In such scenario, despite the absence of a request by the employee, the ADA contemplates an interactive process to assess whether the employee's actual or perceived disability can be reasonably accommodated. *Id.* The NYSHRL has been interpreted in similar fashion. *Miloscia*, 928 N.Y.S.2d at 915 ("an employer has an independent duty to reasonably accommodate an employee's disability if the employer knew or reasonably should have known that the employee

was disabled, whether or not a specific request has been made").

In moving for summary judgment on Glaser's accommodation claim, defendants contend that Glaser's disability was not obvious and that they therefore had no duty to accommodate him. For the reasons discussed in connection with Glaser's discriminatory discharge claims, the Court concludes that whether Gap knew or should have known Glaser was disabled constitutes a genuine issue of material fact.[9] Defendants further argue that the accommodation Glaser asserts he should have been provided is unreasonable as a matter of law. Defendants fail to support this position by identifying an undue hardship to its business. Defendants' motion for summary judgment is DENIED with respect to Glaser's accommodation claims under the ADA and the NYSHRL.

### D. *Individual Liability*

Under the NYSHRL, an individual may be held liable for aiding, abetting, inciting, compelling, or coercing any act of discrimination forbidden by the NYSHRL or attempting to do so. N.Y. Exec. Law § 296(6) (McKinney 2012). Defendants contend that Glaser's "aid and abet" claim against Mejorado should be dismissed because Mejorado did not participate in the decision to discharge Glaser, and because Gap did not discriminate against or fail to accommodate Glaser, so Mejorado cannot be an aider or abettor. With regard to the former contention, Glaser responds that Mejorado had an active role in causing Glaser's termination and suggests that Me-

---

9. Defendants argue that, to the extent Glaser's accommodation claims are based on his request for a job coach during his interview in 2002, they are time barred. The Court does not view Glaser's claims so narrowly. Instead, Glaser's legal theory is that, because defendants "regarded" him as disabled, they

had a duty under the ADA and the NYSHRL to at least initiate an interactive process before taking the step of terminating him for behavior that stemmed from his disability. *See* Resp. at 24–26 (docket no. 46). This claim was brought within the limitations period.

jorado made a material misrepresentation to Hoffman about the incident on November 5, 2009. As the nonmoving party, Glaser is entitled to those reasonable inferences from the record before the Court. Defendants have not otherwise established the requisite absence of genuine issues of material fact to warrant summary judgment, and their motion is DENIED with respect to the "aid and abet" claim against Mejorado.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment, docket no. 36, is DENIED.

IT IS SO ORDERED.

The Clerk is directed to send a copy of this Order to all counsel of record.