Wayne STOFFAN and Alana
Stoffan, Plaintiffs,

v.

SOUTHERN NEW ENGLAND
TELEPHONE COMPANY,
aka, SNET, Defendant.

Civ. No. 03:11CV1630 (AWT).

United States District Court,
D. Connecticut.

Signed March 13, 2014.

Laurel Fedor, Taylor & Fedor, Westport, CT, for Plaintiffs.

Lori B. Alexander, Matthew K. Curtin, Littler Mendelson, P.C., New Haven, CT, for Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ALVIN W. THOMPSON, District Judge.

Plaintiff Wayne Stoffan asserts claims against defendant Southern New England Telephone Company ("SNET") for violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.* (Count One); intentional infliction of emotional distress (Count Two); breach of contract (Count Three); violations of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. § 46a–51 *et seq.* (Count Four); and unjust enrichment (Count Five). Wayne Stoffan's spouse, Alana Stoffan, asserts a derivative claim against SNET for loss of consortium (Count Six). The defendant has moved for summary judgment on all claims. For the

reasons set forth below, the defendant's motion for summary judgment is being granted.

## I. FACTUAL BACKGROUND

SNET hired the plaintiff in 1995 as a provisional full-time installer repairman in its Network Services Department. At the time the plaintiff was hired, he signed a "Provisional Regular Employment Agreement" which stated,

I have been informed that the job I am accepting at SNET is classified as a Provisional Regular Full time position. I understand that this classification signifies that I have been engaged to meet a temporary situation that is expected to continue for more than one year, with the definite understanding that the employment is to terminate on or before resumption of normal conditions or the completion of the job unless my status is changed to regular. If this employment continues beyond three years, my classification will be changed to Regular.

I have been hired as a provisional Full time Installer Repairman in the Network Services Department, and understand that training for this position, which is approximately 4–5 weeks duration is to take place in TBD. Work location Stamford.

(Mem. Supp. Summ. J. (Doc. No. 136) Ex. F). On or about October 13, 1995, the plaintiff became a regular, as opposed to provisional, installer-repairman.

In 2005, the plaintiff was in a car accident in which his car was rear-ended; this resulted in significant injury to his back. He underwent spinal fusion surgery in 2006, but the surgery did not relieve all of his back pain. As a result, the plaintiff occasionally needed to take pain medications when his pain was severe. The plaintiff informed his manager at the time, Butch Haxhi ("Haxhi"), of his occasional need to take pain medications and requested that he be allowed to go home to take them because SNET prohibited employees from taking pain medication while at work due to safety concerns.

In approximately April 2008, the plaintiff accepted a position as a first-level Field Manager of Network Services for SNET's U–Verse Department. As a manager, the plaintiff's duties consisted of managing crews of technicians and their vehicles, communicating with crews regarding how to install DSL, ordering parts and supplies, "imputing and compiling data into the SNET computers," and informing crews regarding company safety procedures and other policies. (Stoffan Aff. ¶ 4).

The plaintiff's new supervisor when he became a manager was Daniel Chantlos ("Chantlos"), who was an Area Manager of Network Services for U–Verse and a "second-level" manager. (Defendant's Local Rule 56(A)(1) Stmt. (Doc. No. 137) ¶ 6). At some point, Chantlos asked the plaintiff whether he was taking medications, and when the plaintiff replied that he was, Chantlos questioned whether he had informed Haxhi of his need to take medications. The plaintiff told Chantlos that, in accordance with SNET procedure, he had told Haxhi. Chantlos remained the plaintiff's supervisor until the termination of the plaintiff's employment with SNET in February 2010.

Occasionally while working for Chantlos, the plaintiff would need to go home to take pain medication if his back pain was too severe. Additionally, he sometimes had to leave work to attend doctors' appointments. When he needed to be away from work at these times, the plaintiff would ask Chantlos for permission. Chantlos never refused any of the plaintiff's requests to leave, but Chantlos did tell the plaintiff to keep his cellphone on.

The plaintiff states that his workload increased while he was working for Chantlos. Chantlos increased the plaintiff's number of consecutive working days, scheduled him to work most holidays, and increased the plaintiff's crew from fifteen technicians to between twenty and thirty technicians. The plaintiff felt overwhelmed by the workload, and in August 2008, his primary care physician recommended that he go to a hospital emergency room for a psychological examination because he was expressing symptoms of anxiety and depression. However, when he returned to his primary care physician in May 2009, the plaintiff did not tell his physician that he was still experiencing depressive symptoms.

In 2009, Chantlos transferred the plaintiff from his assignment as manager of SNET's Stratford garage to an assignment as manager of SNET's Stamford garage. The parties dispute the extent to which the transfer was voluntary. The defendant states that Chantlos suggested the transfer because he needed a manager in Stamford and because the transfer would separate the plaintiff and another employee with whom the plaintiff was having a personal issue. The defendant further states that the plaintiff voluntarily agreed to the transfer and expressed no reservation about the transfer to Chantlos. The plaintiff states that he objected to the transfer, but ultimately felt as though he did not have a choice in the matter.

Once the plaintiff completed his assignment at the Stamford garage, he was transferred to SNET's New Haven garage. The plaintiff worked out of the New Haven garage for the remainder of his employment with SNET.

On December 29, 2009, SNET's Asset Protection Client Services Group received an anonymous call which reported that the plaintiff had ordered certain equipment which SNET identified as not normally used by U–Verse employees. The equipment included large portable light stands with halogen lights and two axes. As a result of the call, Harry Bermas ("Bermas"), a Lead Analyst in Asset Protection, conducted an investigation into the allegations.

On January 25, 2010, Bermas spoke with Chantlos about what the anonymous caller had reported. Chantlos stated that he was not aware of the order and that it was not equipment normally ordered by a U–Verse manager. Chantlos told Bermas that they would have to determine whether there was an unusual circumstance that had warranted the plaintiff's order. Bermas obtained a copy of the equipment ordering history for Chantlos's managers, including the plaintiff. The history showed that the plaintiff had ordered two axes on September 7, 2009 and that he had ordered two portable light stands with halogen lights on September 9, 2009. The lights were delivered on September 28, 2009.

Bermas interviewed the plaintiff on February 4, 2010 in the presence of Chantlos. Bermas showed the plaintiff the order for the light stands and asked the plaintiff where the light stands were currently located. The plaintiff stated that the light stands were at his residence in Trumbull, but he later told Bermas that the light stands were located in a barn at his uncle's house in Monroe, Connecticut.[1] The plaintiff told Bermas that approximately four months earlier he had gone to his uncle's home to fix his uncle's U–Verse service. The plaintiff acknowledged that did not go to his uncle's home as a result of a company appointment scheduled through SNET,

---

1. The parties dispute whether the plaintiff first represented that the light stands were located in an equipment storage room in SNET's Stamford work center.

but instead went as a favor to his uncle. He also stated that he did not want his uncle to have to make a service call because it would reflect negatively on the technician who had originally installed the equipment at his home. With regard to the two axes, the plaintiff stated that he had given one of the axes to another manager, Michael Pirro, and that he had ordered it for work related purposes.

At that time, Bermas stopped the interview so that he and the plaintiff could collect the light stands from the plaintiff's uncle's home. When they arrived at the plaintiff's uncle's home, the plaintiff led Bermas to a barn on the property. From the barn Bermas initially collected two tool bags full of SNET tools. The plaintiff then moved a blue tarp under which there were two boxes containing the light stands and the lights, a third tool bag containing SNET tools, a box of CAT–5 cable, a DeWalt drill box, and an axe, all of which were SNET property. Bermas collected all of the SNET property, and he and the plaintiff then returned to the SNET work center in New Haven where Bermas secured the equipment.

Bermas then continued the interview with the plaintiff. The plaintiff claimed he could not remember why he had left the equipment and tools at his uncle's house, but he believed it might have been because of a weather issue. He stated that the tool bags and drill had come from an employee's vehicle that he had cleaned out when the employee was terminated. However, the plaintiff could not recall any details about the employee or which truck the tools had come from. The plaintiff stated that until the interview with Bermas, he had forgotten that he had left the tools and equipment in his uncle's barn.

At the conclusion of the interview, SNET immediately suspended the plaintiff pending completion of Bermas's investiga-tion. On February 10, 2010, Bermas issued an Asset Protection Report of Investigation, and based on his factual findings, SNET concluded that the plaintiff had stolen company property. Upon receipt of the report, Chantlos conferred with his manager, Stephen McNamara ("McNamara"), to determine what level of disciple to impose. Chantlos believed that the plaintiff had stolen SNET property because he did not find the plaintiff's version of events to be credible, and therefore, in consultation with McNamara, Chantlos determined that the plaintiff should be terminated.

Chantlos asked the plaintiff to come to SNET's New Haven work center for a meeting on February 12, 2010 to discuss his suspension. Cathy McDonald, another SNET manager, accompanied Chantlos to the meeting. At that time, the plaintiff was told that his employment was being terminated.

As part of the plaintiff's compensation during his employment with SNET, he was eligible to receive annual Incentive Awards. Such awards were generally paid out by SNET in or around the first week of March in a given year. On or about January 28, 2010 the plaintiff received a compensation statement which stated the amount of his target annual bonus. With regard to bonuses, the compensation statement provides:

> The Target Annual Bonus is an estimated value and is based on the Level Percentage multiplied by the Current Base Salary for the Level.... Actual Annual Bonus payment will vary based on factors which include, but are not limited to: final Board approved results, employee movement, employee salary changes, or employment status changes.
>
> . . .
>
> AT & T reserves the right to change, amend, or terminate the Management

and Sales Compensation Plan and Administrative Guidelines at any time. This includes, for example, the right to change the Annual Bonus target percentage for each level. Notwithstanding anything in the Plan to the contrary, the Company also retains the right to increase, decrease, or eliminate altogether the payment of any amount of Annual Bonus and/or Key Contributor Award, at the sole discretion of the Company. (Mem. Supp. Summ. J. Ex. G). The plaintiff did not receive an annual bonus in March 2010 after his employment was terminated.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). Rule 56(a) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Com'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* As the Court observed in *Anderson:* "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Thus, only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most

favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 315 (2d Cir.1997) (internal quotation marks omitted) (quoting *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock*, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines,*

*Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A. Count One and Count Four: Violation of ADA and CFEPA[2]

■ In Count One and Count Four, respectively, of the Amended Complaint, the plaintiff asserts claims for disability discrimination pursuant to the ADA and CFEPA. The plaintiff argues that his employment with SNET was terminated because he was disabled and he had to take pain medications at work. The plaintiff also argues that SNET failed to provide him with reasonable accommodations.

#### 1. Discharge Because of Disability

■ The ADA provides, *inter alia,* that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A claim brought under the ADA follows the familiar burden-shifting framework of Title VII cases: "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *McBride v. BIC Consumer*

---

**2.** "The standards governing discrimination under CFEPA are the same as those governing ADA claims." *Wanamaker v. Westport Bd.*

*of Educ.*, 899 F.Supp.2d 193, 212 (D.Conn. 2012).

*Prods. Mfg. Co., Inc.,* 583 F.3d 92, 96 (2d Cir.2009).

The defendant argues that summary judgment should be granted as to Count One and Count Four because the plaintiff was not disabled within the meaning of the ADA, the plaintiff's employment was not terminated because of any disability and the proffered non-discriminatory reason for terminating the plaintiff's employment is not pretextual.

### a. Prima Facie Case

■ To establish a prima facie case of discrimination arising from adverse employment action, a plaintiff must show "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir.2008). "A plaintiff's burden of establishing a prima facie case is de minimis." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001).

■ The defendant argues that the plaintiff is not disabled within the meaning of the ADA because he was not substantially limited in a major life activity. The defendant moves for summary judgment with respect to both the plaintiff's ADA and CFEPA claims, however, and neither party addresses whether the plaintiff is disabled within the meaning of CFEPA. "CFEPA's definition of physical disability is broader than the ADA's," because CFEPA does not contain a requirement that a plaintiff's impairment "substantially limit" the plaintiff's "major life activities." *Beason v. United Tech.,* 337 F.3d 271, 277–78 (2d Cir.2003). Because the analysis of whether summary judgment should be granted on Count One and Count Four otherwise proceeds identically under the ADA and CFEPA, the court will assume, without deciding, for the purposes of this motion that the plaintiff is disabled under the ADA and CFEPA.

■ The defendant also argues that the plaintiff has not shown that he was terminated "because of" his disability. The plaintiff argues that various actions and policies of the defendant show a discriminatory animus on the basis of disability. The plaintiff first argues that SNET "did not want [the plaintiff] driving their company vehicles using a handicap parking permit" and that the plaintiff "was ridiculed and pressured from using [such permits]." (Pls.' Mem. Opp'n Mot. Summ. J. (Doc. No. 146) at 14). The plaintiff has presented no evidence to support his contention that the defendant did not want him to use a handicap parking permit. With respect to his assertion that he was ridiculed for using the permit, the plaintiff testified at his deposition that the only comments that were made to him about his use of the handicap permit were made "jokingly" by "a couple of girls that used to smoke right in front of the main entrance." (Stoffan Dep. at 230). However, the plaintiff did not testify that any comments regarding the handicap permit were ever made by Chantlos or any of his superiors. The "girls" who made the comments held positions that were lower than the plaintiff's and they did not work for him. *Id.* at 231.

The plaintiff claims that SNET had an on-going policy to reduce sick time. In support of this allegation, the plaintiff cites a document from 2004 which states as a goal "Reduce days absent per technician by 10%" (Pls.' Mem. Opp'n Mot. Summ. J. Ex. 8d) and SNET's Amended Answer to his CHRO complaint in which SNET stat-

ed "[t]he Company goal to reduce sick time existed; however, it was not an individual goal." (Pls.' Mem. Opp'n Mot. Summ. J. Ex. 7b). This evidence does not, however, support the plaintiff's claim that he was terminated because of his disability, especially in light of his own testimony that he was not out sick very often and the fact that Chantlos confirmed that the plaintiff's "sick time off was not excessive ... and he was not disciplined or counseled about excessive time taken off." (Chantlos Aff. ¶ 5).

The plaintiff also argues that certain actions taken by Chantlos showed that Chantlos "harbored discriminatory animus toward plaintiff based on his disability." (Pls.' Mem. Opp'n Mot. Summ. J. at 20). The plaintiff argues that the fact that Chantlos asked him whether he was using prescription medications is evidence of discriminatory animus. At his deposition, the plaintiff testified that Chantlos asked him whether he had told Haxhi about his need to take medications and advised the plaintiff that failure to disclose use of prescription medications was grounds for termination. But the plaintiff also testified that Chantlos asked him that question because the plaintiff "had one of those goofy moments" that was sometimes caused by his pain medications. (Stoffan Dep. at 172–75). The plaintiff further admitted that it was reasonable for Chantlos to ask him about his medications because if they caused him to be impaired, that could create a safety concern. Thus, the evidence offered by the plaintiff displays a concern on the part of Chantlos that the plaintiff's medications could cause a safety issue, not that Chantlos harbored an anti-disability bias.

The plaintiff also contends that Chantlos's animus was manifested by his transfer of the plaintiff to the Stamford garage and increasing the plaintiff's hours and job responsibilities. However, as to the transfer, Chantlos averred that the plaintiff was transferred because the Stamford garage needed a new manager and he thought the plaintiff would do a good job there. Additionally, a technician in the Stratford garage had filed a sexual harassment complaint against the plaintiff, and Chantlos thought it would be good to give the plaintiff some distance from the complaining technician. The plaintiff has set forth no facts to contradict that these reasons, and not a discriminatory reason, motivated the transfer. As to the plaintiff's increased hours and work responsibilities, the plaintiff testified that beginning at least in 2007, all of the Level 1 managers were working long hours. The plaintiff has set forth no facts to show that he was singled-out in receiving long hours or that the motivation behind his increased duties was discriminatory.

Thus, the plaintiff has not satisfied his de minimis burden of producing evidence that establishes a prima facie case that he was terminated because of his disability.

### b. Legitimate Non–Discriminatory Purpose

However, even if the plaintiff could establish a prima facie case of disability discrimination, the defendant has set forth a legitimate non-discriminatory reason for his termination and, as discussed below, the plaintiff has failed to produce evidence that could show that the reason given is a pretext for disability discrimination.

Once a plaintiff has come forward at the summary judgment stage with sufficient evidence to establish a prima facie case, "it creates a presumption that the employer discriminated against the employee in an unlawful manner." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998). At this point, "the employer must offer through the introduction of admissible evidence a legitimate non-discrim-

inatory reason for the discharge." *McBride,* 583 F.3d at 96.

■ The defendant states that the plaintiff's employment with SNET was terminated because it determined that the plaintiff had stolen company property. After receiving the anonymous call about the plaintiff's purchase of the portable light stands and axes and after speaking with Chantlos, Bermas, as Lead Analyst in Asset Protection, conducted an investigation into the allegations. Upon receiving the results of the investigation conducted by Bermas, Chantlos concluded that the plaintiff's "statements that he had simply forgotten about the large amount of equipment found at his uncle's barn for several months [were not] credible." (Chantlos Decl. ¶ 20). Chantlos also found the plaintiff to be misleading "because he changed his story three times in the interview with Mr. Bermas before he admitted that the equipment was at his uncle's house." *Id.* Thus, Chantlos concluded that the plaintiff had stolen the property.

The defendant has established, and the plaintiff concedes, that theft of company property is a terminable offense. Based on Chantlos's conclusion that the plaintiff had stolen the various pieces of equipment which were found in the plaintiff's uncle's barn, Chantlos and McNamara concluded that the plaintiff should be terminated.

Because the defendant has proffered a legitimate nondiscriminatory reason for termination of the plaintiff's employment, the "ultimate burden then rests on the plaintiff to persuade the fact finder that the employer's proffered explanation is merely a pretext for its intentional discrimination." *Greenway,* 143 F.3d at 52.

### c. Pretext

The plaintiff contends that the defendant's stated reason that it terminated the plaintiff's employment because of theft is pretextual. The plaintiff points to a letter of discipline from 1999 which states that theft of company property is a terminable offense, "absent significant mitigating circumstances." (Pls.' Mem. Opp'n Mot. Summ. J. Ex. 1c). The plaintiff argues that there were mitigating circumstances in his case and asserts, without citing any evidence, that those circumstances were not given any consideration. He also argues that he should have been given progressive discipline instead of termination. However, the plaintiff admitted during his deposition that he had never "seen a policy of SNET that indicates that managers get progressive discipline" and that he was not aware of any policy or agreement that provided progressive discipline for him. (Stoffan Dep. at 280–82). Additionally, the plaintiff testified that he could not recall anyone who was accused of theft who was not terminated.

The plaintiff also contends that the equipment he took constituted "minor tools which were routinely replaced" and that it was "peculiar that a company with an inventory policy that gives two weeks prior notice, would seek to locate a few bags of minor tools on a moment[']s notice on an anonymous telephone call." (Pls.' Mem. Opp'n Mot. Summ. J. at 14, 21). In support of his argument that the equipment constitutes "minor tools which were routinely replaced," the plaintiff cites a "Minor Tool Requisition on Supply Locker" form. (Pls.' Mem. Opp'n Mot. Summ. J. Ex. 4c). However, the form does not show that the tools were "routinely replaced" and some of the items recovered from the plaintiff's uncle's barn, particularly the light stands and axes, do not appear on the form at all.

In addition to the above arguments, the plaintiff also points to what he contends is evidence of Chantlos's animus, which is discussed above. However, none of this

claimed evidence helps create a genuine issue of material fact as to whether the defendant's stated reason for terminating the plaintiff's employment is pretextual. Because the plaintiff has not shown that the reason given for his termination was pretextual, and even if he could, he has not shown that the real reason for termination of his employment was his disability, the motion for summary judgment is being granted as to the plaintiff's claim for adverse employment action in violation of the ADA and CFEPA in Count One and Count Four of the Amended Complaint, respectively.

### 2. Failure to Accommodate

The plaintiff claims that the defendant was aware of his disabilities and denied his reasonable requests for accommodations.

■ A plaintiff presents a prima facie case of disability discrimination arising from a failure to accommodate by showing: "(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." McBride, 583 F.3d at 97. As with the plaintiff's claim for adverse employment action discrimination, the court assumes, without deciding, that the plaintiff is disabled under the ADA and CFEPA.

■ "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment." Id. To satisfy this burden, the plaintiff must establish both that his requested accommodation would enable him to perform the essential functions of his job and that it "would allow him to do so at or around the time at which it is sought." Graves v. Finch Pruyn & Co., 353 Fed.Appx. 558, 560 (2d Cir.2009). However, the ADA "does not require the employer to provide every accommodation a disabled employee may request." Scalera v. Electrograph Sys., Inc., 848 F.Supp.2d 352, 368 (E.D.N.Y.2012). "Nor does the ADA obligate the employer to meet the personal preferences of disabled employees." Robinson v. Roosevelt Union Free Sch. Dist., No. 10–cv–834(SJF)(ETB), 2012 WL 1980410, *9 (E.D.N.Y. May 31, 2012).

■ The plaintiff argues in his opposition memorandum that he requested two accommodations:[3] (1) that he be allowed to leave work to take pain medications and attend doctors' appointments, and (2) that he not be transferred to the Stamford garage because the drive caused him pain. The defendant argues that, as an initial matter, the plaintiff was performing the essential functions of his job, and thus, there was nothing for the defendant to accommodate.

With respect to the plaintiff's request that he not be transferred to Stamford because it involved a longer commute, the plaintiff has not shown that he was unable to perform the essential functions of his job in Stamford without the requested accommodation. In fact, at his deposition, the plaintiff testified that while he was work-

3. The court notes that the plaintiff was asked at his deposition whether he ever made a request for any medical accommodations while he was at SNET, and he replied, "I possibly could have but I'm not 100 percent sure." (Stoffan Dep. at 207–08). He was then asked if he could identify any request for accommodation, and the plaintiff stated "Off the top of my head, no, I cannot." Id. at 208. Additionally, the plaintiff was asked "Were there any accommodations for any medical condition that you asked for that were not provided to you?" The plaintiff responded, "No." Id. at 357.

ing in Stamford he received an award for improving the productivity of his technicians. He further stated that he was able to do his job, he did so at a satisfactory level and he was not substantially impaired in his ability to do his job. Thus, there is no genuine dispute as to whether the plaintiff was able to perform the essential functions of his position without an accommodation, and therefore the defendant was under no duty to agree to the plaintiff's request that he not be transferred to Stamford.

With respect to the plaintiff's request that he be allowed to leave work to take his medication and attend doctor's appointments, the plaintiff testified that he was not allowed to take pain medications at work, but at times the pain was so bad that he had to go home to take them. Thus, the court will assume that on those occasions the plaintiff was unable to perform the essential functions of his position.

However, it is undisputed that the plaintiff was provided with an accommodation to leave work to take his medications and to attend doctors' appointments. The plaintiff testified that Chantlos never said that he could not go home when the plaintiff requested that he be allowed to do so. Likewise, Chantlos never told the plaintiff that he could not leave work to attend a doctor's appointment. The plaintiff appears to argue that his request was denied because he was told that he had to keep his cell phone on when he left work. The plaintiff has not explained, however, how turning his cell phone off would have allowed him to perform the essential functions of his employment. *See McBride,* 583 F.3d at 97. The plaintiff's desire to turn his cell phone off amounts to a personal preference, not an accommodation the defendant was required to provide.

Because the plaintiff has failed to establish a genuine issue of material fact as to whether he was unlawfully denied a reasonable accommodation by the defendant, the motion for summary judgment is being granted as to the plaintiff's claim in Count One and Count Four of the Amended Complaint that he was denied reasonable accommodations.

### B. *Count Two: Intentional Infliction of Emotional Distress*

In Count Two of the Amended Complaint, the plaintiff asserts a claim for intentional infliction of emotional distress. He claims that Chantlos made "a number of unreasonable demands [on the plaintiff] such as working 60 hours a week, working 23 and 37 days straight in a row ... adding more crew, and [adding] responsibilities" when Chantlos knew that the plaintiff was "having trouble functioning and coping." (Pls.' Mem. Opp'n Mot. Summ. J. at 23).

To state a claim for intentional infliction of emotional distress, a plaintiff must allege: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 443, 815 A.2d 119 (2003). Conduct is extreme and outrageous if it "go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Id.* "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." *Appleton v. Bd. of Educ. of Town of Stonington,* 254 Conn. 205, 210, 757 A.2d 1059 (2000).

In the present case, the plaintiff has failed to cite any facts which could support an inference that Chantlos intended to inflict emotional distress or that he knew the plaintiff was likely to experience emotional distress as a result of his actions. While the plaintiff states that Chantlos knew that he was "having trouble functioning and coping" (Pls.' Mem. Opp'n Mot. Summ. J. at 23), he provides no evidence to support this contention. The plaintiff does not produce evidence that Chantlos knew that the plaintiff had gone to the hospital for a psychiatric evaluation or even that Chantlos knew that the plaintiff was feeling overwhelmed with his job responsibilities. Although it is disputed whether Chantlos knew that the plaintiff was taking pain medication for his back, even if Chantlos did know that, the plaintiff has not shown that Chantlos should have known that increasing the plaintiff's responsibilities in light of his back pain would cause him emotional distress.

██ Additionally, the plaintiff has not shown that Chantlos's conduct was atrocious and utterly intolerable in a civilized community. "In the employment context, it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous." *Miner v. Town of Cheshire*, 126 F.Supp.2d 184, 195 (D.Conn. 2000). "[R]outine employment action, even if made with improper motivations, does not constitute extreme or outrageous behavior." *Adams v. The Hartford Courant and Tribune Co.*, No. 3:03–cv–0477(JCH), 2004 WL 1091728, *4 (D.Conn. May 14, 2004). "Further, individuals in the workplace should expect to experience some level of emotional distress." *Id.*

"[T]he bar for conduct that is found to be 'extreme and outrageous' is set very high." *Holmes v. Town of East Lyme*, 866 F.Supp.2d 108, 135 (D.Conn.2012). *See, e.g., Sousa v. Roque*, No. 3:05–cv–822(JCH), 2005 WL 3543721, *4 (D.Conn. Dec. 16, 2005) (stating that defendants' refusal to allow the plaintiff to extend his medical leave and their rejection of his request to work from home, as alleged, are routine employment actions and therefore not extreme or outrageous); *Armstead v. Stop & Shop Cos., Inc.*, No. 3:01–cv–1489(JBA), 2003 WL 1343245, *4 (D.Conn. Mar. 17, 2003) (holding that conduct by the plaintiff's employer that "consisted of terminating him because of his physical condition; refusing to provide reasonable accommodation for lifting and bending restrictions; and failing and refusing to schedule plaintiff for work, notify him of his termination, and provide him with a pink slip in contravention of defendant's policy" was not extreme or outrageous); *Cavuoto v. Oxford Health Plans, Inc.*, No. 3:99–cv–446(EBB), 2000 WL 888263, *1–2, 8 (D.Conn. June 22, 2000) (finding that employer's conduct was not extreme or outrageous where the plaintiff was required to work sixty-five hours per week, was not provided assistance by supervisors, and was excluded from senior management meetings because she was an "hysterical female").

Because of the fact that routine employment action, even if taken because of improper motivations, does not constitute extreme or outrageous behavior, no reasonable jury could find that the defendant's actions in this case were extreme or outrageous. Therefore, the motion for summary judgment is being granted as to Count Two of the Amended Complaint.

### C. *Count Three: Breach of Contract*

In Count Three of the Amended Complaint, the plaintiff brings a claim for breach of contract. The plaintiff argues that he was not an at-will employee, and therefore, good cause was required for his termination. The plaintiff argues that

"there are at minimum two writings that control the parties['] employment relationship." (Pls.' Mem. Opp'n Mot. Summ. J. at 23). The first is the "Provisional Regular Employment Agreement" and the second is a "Trade Secrets and Confidential Information" (Pls.' Mem. Opp'n Mot. Summ. J. Ex. 1b) form, both of which the plaintiff was required to sign when he was hired. However, the plaintiff's argument that these two writings took him out of the status of an at-will employee is without merit.

Under Connecticut law, "an employment contract is presumed to be terminable at will." *Lockwood v. Prof'l Wheelchair Transp., Inc.,* 37 Conn.App. 85, 94, 654 A.2d 1252 (1995). This general rule applies to contracts of permanent employment or for an indefinite term. *See Torosyan v. Boehringer Ingelheim Pharm., Inc.,* 234 Conn. 1, 14, 662 A.2d 89 (1995). "Pursuant to traditional contract principles, however, the default rule of employment at will can be modified by the agreement of the parties." *Id.* at 15, 662 A.2d 89. Such modification may be either express or implied. *See Gaudio v. Griffin Health Servs. Corp.,* 249 Conn. 523, 532, 733 A.2d 197 (1999) (stating that an employer's statements may "give rise to an express or implied contract between employer and employee.").

It is unclear whether the plaintiff is arguing that he had an express or an implied employment contract. Where a plaintiff argues that his employer breached an express employment contract by terminating him without just cause, as the plaintiff does here, "the plaintiff must show that the agreement included a just cause or fixed-term provision." *McKinstry v. Sheriden Woods Health Care Center, Inc.,* 994 F.Supp.2d 259, 265, No. 3:13–cv–200(AWT), 2014 WL 407496, *4 (D.Conn. Feb. 4, 2014) (citing *Slifkin v.*

*Condec Corp.,* 13 Conn.App. 538, 549, 538 A.2d 231 (1988)). Neither of the two writings referenced by the plaintiff contains a just cause or fixed-term provision. The "Provisional Regular Employment Agreement" provides that the plaintiff was originally hired by SNET to "meet a temporary situation," but that if his employment continued beyond three years, he would become a "regular" employee. At the time of his termination, the plaintiff was a "regular" employee. (Stoffan Dep. at 134–35). The "Provisional Regular Employment Agreement" contains no language concerning how long the plaintiff's position would last once, and if, he became a regular employee, and it does not contain a just-cause provision. The "Trade Secrets and Confidential Information" agreement governs the protection of SNET trade secrets and confidential information. It makes no mention whatsoever of just cause or a fixed-term of employment. Therefore, to the extent the plaintiff contends that SNET breached his employment contract by terminating him without good cause, the plaintiff must show that he had an *implied* employment contract.

"A contract implied in fact, like an express contract, depends on actual agreement." *Reynolds v. Chrysler First Commercial Corp.,* 40 Conn.App. 725, 730, 673 A.2d 573 (1996). Accordingly, "[t]o prevail on a breach of an implied employment agreement, the plaintiff must allege that the employer had agreed, by words or conduct, to continue his employment absent just cause for termination." *Naser v. Ravago Shared Servs., LLC,* No. 3:10–cv–573(WWE), 2010 WL 3829159, *3 (D.Conn. Sept. 20, 2010). "Such an agreement may be based on an employer's representations to the effect that the employee will not be terminated under certain circumstances or except for good cause or that employment will continue as long as certain conditions

are met." *Felekey v. Am. Tel. & Tel. Co.,* No. 3:02–cv–691(CFD), 2004 WL 2958468, *4 (D.Conn. Nov. 3, 2004).

The plaintiff argues that the "Provisional Regular Employment Agreement" and the "Trade Secrets and Confidential Information" agreement evidence a long term and continued relationship between the parties. He then states that the documents evidence an intent of the parties that the plaintiff could be dismissed solely for cause. However, a plain reading of each document provides no support for that conclusion. The documents are devoid of any reference to just cause or a fixed-term of employment.

Beyond the two documents, the plaintiff points to no representations made to him by SNET that he would only be terminated for good cause or that his employment would continue as long as certain conditions were met. At his deposition, the plaintiff alluded to the fact that he thought Level 1 managers, like himself, were subject to the same progressive discipline policy as union employees. However, the plaintiff admitted that he had never "seen a policy of SNET that indicates that managers get progressive discipline" and that he was not aware of any policy or agreement that provided progressive discipline for him. (Stoffan Dep. at 280, 282). Furthermore, it is undisputed that the plaintiff was not a union employee at the time that he was terminated. Thus, the plaintiff's unfounded belief that he "thought [SNET] had to follow guidelines" before he could be terminated does not create a genuine dispute of material fact as to whether he was an at-will employee. *Id.* at 281.

The plaintiff argues, in the alternative, that if he *was* an at-will employee, the termination of his employment violated public policy and he should therefore be able to recover for wrongful discharge. He argues that it was wrongful for SNET to terminate his employment based on his disability. "If, however, a relevant state or federal law contains a private right of action which serves to protect the public policy allegedly violated, a wrongful discharge claim will fail." *Nanos v. City of Stamford,* 609 F.Supp.2d 260, 268 (D.Conn. 2009) (citing *Burnham v. Karl & Gelb, P.C.,* 252 Conn. 153, 159–60, 745 A.2d 178 (2000)). In Connecticut, the important public policy of preventing disability discrimination in the workplace is "adequately addressed by the presence of the ADA and CFEPA." *Grunberg v. Quest Diagnostics,* 3:05–cv–1201(VLB), 2008 WL 323940, *11 (D.Conn. Feb. 5, 2008). "[T]he common-law discharge claim is not a valid theory of recovery that the plaintiff could 'fall back' on should his ... ADA claim[ ] fail: '[t]he wrongful discharge cause of action is not intended to be a catch-all for those who either procedurally or on the merits fail to establish a claim under existing discrimination statutes.'" *Honeck v. Nicolock Paving Stones of N.E., LLC,* No. 3:04–cv–1577(JBA), 2005 WL 1388736, *3 (D.Conn. June 10, 2005) (quoting *Kilduff v. Cosential, Inc.,* 289 F.Supp.2d 12, 18 (D.Conn.2003)). Rather, "the plaintiff's claim is precluded by virtue of the *existence* of a statutory remedy under" the ADA and CFEPA. *Burnham,* 252 Conn. at 161–62, 745 A.2d 178 (emphasis added).

Because there is no genuine issue of material fact as to whether the plaintiff was an at-will employee and he cannot state a claim for wrongful discharge, the motion for summary judgment is being granted as to Count Three of the Amended Complaint.

### D. *Count Five: Unjust Enrichment*

In Count Five of the Amended Complaint, the plaintiff brings a claim for unjust enrichment. The plaintiff claims that SNET was unjustly enriched when it failed

to pay him, after he was terminated, a bonus for the work that he had done in the previous year.

 "A plaintiff seeking recovery for unjust enrichment must prove: (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiff[ ] for the benefits, and (3) that the failure of payment was to the plaintiff['s] detriment." *Carney v. Lopez,* 933 F.Supp.2d 365, 384 (D.Conn.2013). The doctrine of unjust enrichment is "based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff." *Gagne v. Vaccaro,* 255 Conn. 390, 401, 766 A.2d 416 (2001).

 The plaintiff argues that he "worked for the bonus throughout 2009" and that "[h]is contributions as part of a team with other SNET employees allowed SNET to meet its goals for the year 2009." (Pls.' Mem. Opp'n Mot. Summ. J. at 32). He further states that "SNET has benefited from the diligent effort of [the plaintiff] to achieve high performance to the best of his ability." *Id.* at 33. It is undisputed that SNET benefitted from the plaintiff performing his job duties.

However, the plaintiff does not show that SNET unjustly did not pay him for the benefits that he conferred. The plaintiff was paid his regular salary for his labor in 2009. While he thinks that he should also have received a bonus in March 2010 in exchange for "perform[ing] to the best of his ability," whether to pay the plaintiff a bonus was within SNET's sole discretion. The plaintiff's January 28, 2010 compensation statement states that "Actual Annual Bonus payment will vary based on," *inter alia,* "employment status changes." (Mem. Supp. Summ. J. Ex. G). The statement then provides that "the Company also retains the right to ... eliminate altogether the payment of any

amount of Annual Bonus ... at the sole discretion of the Company." *Id.* Furthermore, the plaintiff testified at his deposition that he did not have a contract or agreement which provided that bonus payments are made to employees who have left the company.

The plaintiff testified that before he was terminated, he received "a generic email from headquarters" saying that bonus incentive awards for 2009 would be paid out. (Stoffan Dep. at 157). However, he then conceded that the email addressed whether there would be any payout at all. Thus, the email does not create a genuine issue of material fact as to whether the plaintiff himself was promised that he would receive a bonus which was then denied. Rather the email confirms that whether bonuses would paid at all was within sole discretion of the defendant.

The plaintiff has failed to create a genuine issue of material fact as to whether the defendant was unjustly enriched when it failed to pay him a bonus payment after he was terminated. Therefore, the motion for summary judgment is being granted as to Count Five of the Amended Complaint.

### E. *Count Six: Loss of Consortium*

In Count Six of the Amended Complaint, plaintiff Alana Stoffan brings a claim for loss of consortium. She claims that she was deprived of the plaintiff's "companionship, services, consortium, and society." (Amend. Compl. (Doc. No. 81) ¶ 57).

 "Actions for loss of consortium are derivative causes of action dependent on the legal existence of the predicate action." *Ghimbasan v. S & H Express, Inc.,* 814 F.Supp.2d 120, 129 (D.Conn.2011). Because the motion for summary judgment is being granted as to each of the plaintiff's claims, there is no cause of action upon which the derivative claim can be based.

Therefore, the motion for summary judgment is being granted as to Count Six of the Amended Complaint.

## IV. CONCLUSION

For the reasons set forth above, the defendant's Motion for Summary Judgment (Doc. No. 135) is hereby GRANTED. Judgment shall enter in favor of defendant Southern New England Telephone Company on all the claims in the plaintiffs' complaint.

The Clerk shall close this case.

It is so ordered.